```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION


Roberta Linderman, on behalf    )
of Plaintiff and the class      )
members described herein,       )
                                )
          Plaintiff,            )
                                )
                                )
     v.                         )    No. 25 C 4271
                                )
                                )
NewRez LLC, doing business as   )
Shellpoint, and The Bank of     )
New York Mellon,                )
                                )
          Defendants.           )
```

Memorandum Opinion and Order

In this suit, Roberta Linderman claims that NewRez LLC, d/b/a Shellpoint, and The Bank of New York Mellon ("BNYM"), violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 *et seq.*, when they sought to collect on what she says is a time-barred debt for which she had not received monthly statements for years. She brings these claims individually and on behalf of a class, and, in addition to relief under the FDCPA and ICFA, seeks a declaratory judgment and injunctive relief. Shellpoint and BNYM move to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, the motion is granted.

I.

According to the amended complaint, in June 2006 Linderman obtained a home equity line of credit ("HELOC") from Countrywide Bank, N.A., secured by her residence. *See* Am. Compl. App'x B, ECF 18-1 at 9-19 (HELOC agreement). Under the agreement, during the 60-month Draw Period, which would be automatically extended by an additional 60 months absent notification by Countrywide, Linderman was permitted to request amounts up to the $87,100 credit limit. During this time, the agreement provided that she would pay certain finance and other charges each month, depending on her use of the line of credit. Then, during a 180-month Repayment Period, the agreement provided for the repayment of the principal balance, plus interest and other charges. The agreement contained an acceleration clause, under which Countrywide could, under certain circumstances, declare all sums due under the agreement immediately due.

After suffering financial difficulty beginning with the 2008 financial crisis, Linderman filed for Chapter 7 bankruptcy in 2009. The relevant outcome of those proceedings was that Linderman's personal obligation under the HELOC was discharged. At the time she filed for bankruptcy, the balance on the HELOC was $87,080.

Linderman made no payments on the HELOC after August 2008. Nor did she receive any statement regarding the debt between 2009 and 2024. In December 2012, Bank of America--which had earlier

merged with Countrywide--placed Linderman's loan in a securitization trust, for which BNYM is trustee. Countrywide, which following the merger became a unit of Bank of America and, according to the amended complaint, the corporate successor to the original creditor, is the servicer for loans in the trust.

On July 11, 2024, Linderman received a letter from Shellpoint, which is attached to the amended complaint as Appendix D, notifying her that it was the new servicer for her HELOC. Shellpoint subsequently sought to collect on the debt, including in a letter on August 2, 2024, which said that Linderman's loan was delinquent and stated a principal balance of $87,080.13, but said nothing about interest. *See* Am. Compl. App'x E, ECF 18-1 at 38. Following that came another letter on October 3, 2024, notifying Linderman that her loan was more than 30 days past due and providing a 30-day grace period during which Linderman was encouraged to seek housing counseling. *See* Am. Compl. App'x F, ECF 18-1 at 42. On November 5, 2024, Shellpoint sent Linderman another letter stating that she had to pay $140,066.82 to cure default. *See* Am. Compl. App'x G, ECF 18-1 at 44–48. That figure allegedly consisted of the principal balance, interest that had accrued from September 2008 to October 2024, and a $45 "corporate advance." In addition to these letters, Shellpoint began sending Linderman monthly statements starting in July 2024.

II.

A.

Linderman claims that Shellpoint violated the FDCPA and that both defendants violated the ICFA by attempting to collect on a time-barred debt.[1] The parties agree that the five-year statute of limitations in 735 Ill. Comp. Stat. 5/13-205 applies here, but disagree about when that limitations period began to run. In Linderman's view, it started either in 2008 when she defaulted by missing a minimum payment, or in 2014, when she contacted Bank of America to notify it that she was unable to make payments on a separate mortgage that had also been issued by Countrywide. In defendants' view, it will not begin to run until the loan's maturity date, which is in either 2026 or 2031.[2]

Defendants direct me to *Manlangit ex rel. Manlangit v. FCI Lender Services, Inc.*, No. 19-cv-03265, 2020 WL 5570092 (N.D. Ill.

---

[1] As noted, Linderman's personal obligation on the HELOC was discharged via bankruptcy, but the mortgage remains. If the limitations period to collect on the HELOC had expired by the time Shellpoint contacted Linderman, however, that would also bar enforcement of the mortgage. *See United Central Bank v. KMWC 845, LLC*, 800 F.3d 307, 311 (7th Cir. 2015) ("[L]ong-standing Illinois law precludes a plaintiff from foreclosing on a mortgage when an action on the underlying note is barred by the statute of limitations or another procedural rule." (citations omitted)).

[2] It is 2026 if the Draw Period under the agreement was not automatically renewed for an additional 60 months; it is 2031 if that automatic renewal occurred. Am. Compl. App'x B § 1. The amended complaint does not reveal whether renewal occurred, but it makes no difference to the analysis here.

4

Sept. 16, 2020), which considered this very issue.³ The court explained that "when a debt instrument like the one here has a maturity date, under Illinois law the statute of limitations begins to run at the maturity date, not at the time of the first default." *Id.* at *4 (citing *Pan-Am. Life Ins. Co. v. Invex Holdings, N.V.*, No. 96 C 4565, 1996 WL 734692, at *5 (N.D. Ill. Dec. 19, 1996); additional citations omitted). While that may be definitively true for debt instruments like the closed-end mortgage notes in *Invex*, HELOCs have different characteristics, as discussed below.⁴ Indeed, in a recent Illinois appellate court decision considering a similar debt instrument to the one at issue here and in *Manlangit*, the court declined to reach the issue altogether because it did not affect the outcome of the case. *See BMO Bank N.A. v. Zbroszczyk*, ---N.E.3d---, 2025 WL 1702257, at *8 (Ill App. Ct. June 18, 2025). If the rule that the statute of limitations for debt instruments with maturity dates begins at the maturity date were definitively settled as to HELOCs, one might expect the court in *BMO Bank* to have said so.

---

³ The *Manlangit* court abbreviates the debt instrument in that case as "HECLA" instead of "HELOC," but it is materially similar to the one at issue in this case.

⁴ Linderman does not argue that the rule for installment contracts, in which the statute of limitations begins to run on each installment as it becomes due, *see Manlangit*, 2020 WL 5570092, at *4, applies in this case.

5

Nonetheless, *Manlangit* stands as the only case by a court applying Illinois law to have ruled on the issue, at least based on the cases cited by the parties and those turned up in my research. Moreover, federal courts in other districts, applying non-Illinois law, have come to the same conclusion as *Manlangit*. See *Bird v. Real Time Resols., Inc.*, 183 F. Supp. 3d 1058, 1063 (N.D. Cal. 2016) (holding that, absent acceleration, statute of limitations on HELOC will commence at maturity); *Donges v. USAA Fed. Sav. Bank*, 391 F. Supp. 3d 907, 913 (D. Ariz. 2019) (same), *aff'd* 809 F. App'x 406 (9th Cir. 2020). For her part, Linderman supplies no case from any jurisdiction in which a court has squarely concluded that the limitations period for a HELOC began to run on the date of first default.

I agree with those decisions that to hold otherwise would render meaningless the terms of the HELOC agreement setting forth a final maturity date. Moreover, in the event that an acceleration clause is triggered, the statute of limitations begins to run on that date instead of the date of maturity because acceleration requires immediate payment of the full amount of the debt. In the terms of some debt instruments, acceleration is mandatory in the event of a missed payment. But in the HELOC here, as well as the one in *Manlangit*, the acceleration clause is permissive; it may be invoked in the event of a missed payment or other identified occurrence, at the discretion of the creditor. In effect,

6

Linderman's argument would convert the permissive acceleration clause to a mandatory one, requiring the creditor to seek repayment in full within the five-year limitations period from the first default or else surrender its right to repayment. That result would run contrary both to the terms of the HELOC and to the principle that acceleration clauses are intended to protect creditors. *See Donges*, 391 F. Supp. 3d at 913 (observing that starting limitations period on date of first default "would make the HELOC maturity date meaningless and turn the optional acceleration clause--which generally is a protective device for the lender--into a sword for the debtor" (citation omitted)).

Linderman resists this conclusion by arguing that the HELOC in this case is similar to a credit card, for which she says the limitations period begins to run at the first default. I agree with Linderman that HELOCs are similar to credit cards in certain respects, particularly during the Draw Period. As explained by the Illinois appellate court in *BMO Bank*, both are "revolving credit loans," which are "arrangement[s]" under which "the lender may from time to time make loans or advances to or for the account of the debtor," for which the creditor sends periodic bills or statements. 2025 WL 1702257, at *5 (quoting 815 Ill. Comp. Stat. 205/4.1). But there are also differences, such as the fact that HELOCs have a final maturity date, as well as a Repayment Period during which additional draws are not permitted. *See Donges*, 391

7

F. Supp. 3d at 912–13 (noting the presence of a maturity date in HELOCs but not in credit card agreements).

Linderman also cites Illinois trial court decisions she claims treated HELOCs like credit cards. *See* ECF 24-1 at 54–98. But the court documents she provides from those cases contain no reasoning supporting her view. And the motions to dismiss in those cases focused on whether a five- or ten-year statute of limitations applies to HELOCs, not the issue of when the limitations period begins to run. While the similarities between HELOCs and credit cards indeed supports the application of a five-year statute of limitations to HELOCs, *see BMO Bank*, 2025 WL 1702257, at *6–8, but that does not mean the same is true as to the start of the limitations period. As noted, even after deciding that the HELOC in *BMO Bank* was governed by a five-year statute of limitations, the court declined to decide when the limitations period began to run. *See id.* at *8.

Finally, Linderman points to a July 2014 letter she sent to Bank of America (which, recall, had by that time merged with Countrywide, the issuer of Linderman's HELOC) to inform it that she was unable to make payments on a separate mortgage that had also been issued by Countrywide. In her view, that letter repudiated the HELOC agreement because it informed Bank of America that she could no longer perform her obligations under the agreement. *See Hassebrock v. Ceja Corp.*, 29 N.E.3d 412, 422 (Ill.

8

App. Ct. 2015) ("A party repudiates a contract when that party explicitly or implicitly represents that he cannot or will not perform his obligations under the contract." (quoting *Record v. Kempe*, 928 A.2d 1199, 1206 (Vt. 2007)). But it is implausible that Linderman's communication to Bank of America that she would not be able to make payments toward a separate mortgage constituted a repudiation of the HELOC agreement.

Because I agree with defendants that the debt was not time-barred when it sent her letters attempting to collect on it, Counts I and III are dismissed.

B.

Linderman also maintains that 15 U.S.C. § 1637(b), which is part of the Truth in Lending Act ("TILA"), as well as Regulation Z, 12 C.F.R. § 1026.5(b)(2)(i), were violated because she was not sent any billing statements showing interest accruing between 2009 and 2024, despite Shellpoint's 2024 letters showing that interest accrued during that time. Linderman appears to recognize that defendants cannot be held directly liable for violations of the TILA or Regulation Z because neither Shellpoint nor BNYM is a creditor or assignee of a creditor. *See Chow v. Aegis Mortg. Corp.*, 286 F. Supp. 2d 956, 959 (N.D. Ill. 2003) ("The only parties who can be liable for [TILA] violations are the original creditor and assignees of that creditor. Servicers of consumer obligations are not to be treated as assignees for purposes of imposing liability

9

unless they are also the owner of the obligation." (citing 15 U.S.C. §§ 1640, 1641)); *Best v. NewRez LLC*, No. GJH-19-2331, 2020 WL 5513433, at *31 (D. Md. Sept. 11, 2020) ("TILA only imposes liability on creditors and their assignees." (citations omitted)). Instead, she invokes the FDCPA's and ICFA's more general prohibitions on debt collectors' use of unfair or deceptive practices, and claims that defendants' attempts to collect on her debt despite underlying violations of the TILA and Regulation Z violated those prohibitions. *See* 15 U.S.C. § 1692e (prohibiting debt collectors from using "false, deceptive, or misleading" representations); *id.* § 1692f(1) (prohibiting use of "unfair or unconscionable means," including collections of amounts not "expressly authorized by the agreement creating the debt or permitted by law"); 815 Ill. Comp. Stat. 505/2 (prohibiting "unfair or deceptive acts or practices"). Defendants argue that TILA violations, for which they cannot be held directly liable, cannot be repackaged as FDCPA and ICFA violations in this case. I agree.

Numerous courts have rejected attempts by plaintiffs to hold non-creditors like servicers or debt collectors liable under the FDCPA for violations of the TILA. *See, e.g.*, *Richards v. NewRez LLC*, No. ELH-20-1282, 2021 WL 1060286, at *28 (D. Md. Mar. 18, 2021) ("[C]ourts have consistently ruled that the FDCPA 'is not properly used as an enforcement mechanism for the TILA,' especially where the plaintiffs could not succeed on a TILA claim,

10

independently." (collecting cases)). In *Lee v. Northland Grp.*, No. 02 C 6083, 2003 WL 25765398 (N.D. Ill. Apr. 24, 2003), the plaintiff asserted that a debt collector violated the FDCPA and ICFA by attempting to collect a debt despite the fact that she had not received the required periodic monthly statements. *Id.* at *1. Because the debt collector was not a creditor, it could not be held directly liable for TILA violations; and because the FDCPA and ICFA claims were "entirely predicated on [the plaintiff's] nonexistent TILA violation," the court dismissed both claims. *Id.* at *1; *see also Neff v. Cap. Acquisitions & Mgmt. Co.*, 238 F. Supp. 2d 986, 992 (N.D. Ill. 2002) ("Because [the plaintiff's] FDCPA claim is entirely predicated on a nonexistent TILA violation, [his] FDCPA claim must be dismissed."), *aff'd*, 352 F.3d 1118 (7th Cir. 2003). The same is true here.

Relying on *Randolph v. IMBS, Inc.*, 368 F.3d 726 (7th Cir. 2004), which concluded that the Bankruptcy Code did not preempt the FDCPA, Linderman argues that the TILA does not preempt or displace the FDCPA. True enough, but that does not mean that every TILA violation is actionable under the FDCPA. Imposing the TILA's requirements on debt collectors via the FDCPA would contravene Congress's decision to cabin the reach of the TILA to creditors and their assignees alone. *See* 15 U.S.C. § 1640 (creditors); *id.* § 1641 (assignees). At bottom, "the FDCPA does not place an affirmative obligation on a debt collector to . . . send monthly

11

statements," so its failure to do so is not unfair, deceptive, or misleading under the FDCPA or ICFA. *Neff*, 238 F. Supp. 2d at 993. For these reasons, and against a backdrop of caselaw counseling against the propriety of bringing FDCPA and ICFA claims as Linderman has alleged them, Counts II and IV are dismissed.

C.

Counts V and VI are for declaratory judgment and injunctive relief and are premised on the same legal theories as Linderman's FDCPA and ICFA claims: namely, that the debt is not legally enforceable because it is time-barred and that interest cannot be added for periods in which Linderman did not receive a billing statement. "[R]equests for declaratory judgment and injunctions are not independent causes of action," but are instead specific remedies. *Sieving v. Cont'l Cas. Co.*, 535 F. Supp. 3d 762, 774 (N.D. Ill. 2021) (quoting *Elward v. Elecrtrolux Home Prods., Inc.*, 214 F. Supp. 3d 701, 708 (N.D. Ill. 2016)) (citation omitted). Because Linderman has failed to offer a viable legal theory for holding these defendants liable, she cannot obtain declaratory judgments or injunctive relief against them. Counts V and VI are therefore dismissed.

III.

For the foregoing reasons, defendants' motion to dismiss is granted. As this is the first dismissal, Linderman may file a second amended complaint within 30 days of this order, to the

extent she can do so consistent with Federal Rule of Civil Procedure 11. If no second amended complaint is filed within that time, I will dismiss the case with prejudice.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: October 31, 2025

13