IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Roberta Linderman, of behalf )
of Plaintiff and the class )
Members described herein, )
                         )
    Plaintiff, )
                         )
                         )
    v. )        No. 25 C 4271
                         )
                         )
NewRez LLC, doing business as )
Shellpoint, et al., )
                         )
    Defendants. )

Memorandum Opinion and Order

Plaintiff Roberta Linderman brings this second amended complaint against a Delaware-based trust (the CWHEQ Revolving Home Equity Loan Trust, Series 2006-F, or the "Trust"), its trustee (the Bank of New York Mellon, or "BNYM"), and a debt collector (NewRez LLC, doing business as "Shellpoint") who together have been attempting to collect on a loan housed within the Trust. Before me is the defendants' motion to dismiss pursuant to Federal Rule of Procedure 12(b)(6). I deny that motion in part.

**I.**

Defendants have moved to dismiss Linderman's complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Under

1

Rule 8(a)(2), a complaint must contain a "short and plain statement of the claim showing the pleader is entitled to relief." To survive a motion to dismiss under Rule 12(b)(6), complaints need not contain detailed factual allegations, but they must contain more than mere "labels and conclusions," or "formulaic recitation[s] of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007). "After excising" legal conclusions and conclusory allegations, I must "determine whether the remaining factual allegations 'plausibly suggest an entitlement to relief.'" *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)). "Making the plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id*. (quoting *Iqbal*, 556 U.S. at 679). All the same, a motion to dismiss tests the sufficiency of the complaint, not the merits of the plaintiff's claim. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). And facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

2

## II.

In June 2006, Linderman bought a home.[1] Rather than putting down a cash payment of 20%, Linderman took advantage of one of the sub-sub-prime opportunities then on offer, known as an '80/20 mortgage'. She took out a loan for 80% of the price of the property, secured by a primary mortgage on the same. Then she took out a home equity line of credit ("HELOC"), another loan worth 20% of the value of the property, secured by a secondary mortgage, and she used that to make the down payment on the first loan.

A HELOC is effectively a supersized credit card agreement which can be secured, as in this case, by a mortgage on real property. Linderman's HELOC was to operate very much like a credit card would—the agreement provided for her to have a card she could use at merchants and ATMs, it charged a relatively high annual percentage rate of interest (4.5% above the highest prime rate published in the *Wall Street Journal*), and it laid out a schedule of statements that Linderman would receive and in response to which she would have to make at least a minimum payment. ECF 42-1 at 10–19. The major differences between the HELOC and a credit card were that it had a very high credit limit ($87,100), that it started

---

[1] I take the allegations in the complaint as true for the purposes of the motion to dismiss. *See Vinson v. Vermillion County, Ill.*, 776 F.3d 924, 925 (7th Cir. 2015).

maxed out, and that the agreement was divided between draw and repayment periods. During the 60-month draw period, Linderman could use the card and pay it off; during the 180-month repayment period, Linderman could no longer use the card but would continue to pay it off.

Unbeknownst to Linderman, shortly after signing the HELOC, her lender, Countrywide Home Loans, deposited[2] the loan into the Trust.[3] The idea behind this maneuver was to allow the Trust to

---

[2] Technically, CWHEQ, Inc., which was a subsidiary of Countrywide Financial (itself the corporate parent of Countrywide Home Loans), deposited the loan into the Trust. "Prospectus, CWHEQ Revolving Home Equity Loan Trust, Series 2006-F," SEC (Apr. 14, 2006), https://www.sec.gov/Archives/edgar/data/1310402/00011931250614 1973/d424b5.htm#stx95903_1.

Regardless, the loan made it into the Trust and Countrywide, in one of its incarnations, was the servicer for the loans in the Trust until Countrywide, as a result of this kind of lending, failed, at which point it was purchased at a steep discount by a division of Bank of America. Connie Bruck, "Angelo's Ashes," *The New Yorker* (June 22, 2009), https://www.newyorker.com/magazine/2009/06/29/angelos-ashes.

[3] Linderman dates this transaction significantly later, but it seems to have taken place on June 30, 2006. "Form 8-K, CWHEQ Revolving Home Equity Loan Trust, Series 2006-F," SEC (June 30, 2006), https://www.sec.gov/Archives/edgar/data/1366929/00009051480600 4886/0000905148-06-004886.txt;

"Sale and Servicing Agreement, CWHEQ Revolving Home Equity Loan Trust, Series 2006-F," SEC (June 30, 2006), https://www.sec.gov/Archives/edgar/data/1366929/00009051480600 4886/efc6-1978_5903871ex991.txt.

issue securities backed by something like a billion and a half dollars' worth of HELOCs like Linderman's. The purpose of doing so was to obscure the riskiness of the loans and thus to increase the attractiveness of the securities. *See U.S. v. Phillips*, 731 F.3d 649, 651 (7th Cir. 2013) ("This was musical-chairs financing.").

During the financial crisis brought on by these types of schemes, Linderman lost her job. In August 2008, she stopped making payments on the HELOC, at which time the balance on the loan was $87,080. The next year, she filed for bankruptcy, during which she discharged her personal obligation to repay the HELOC, although the mortgage remained. At the time that Linderman stopped payments, Countrywide was still the servicer of the HELOC. A few years later, in 2014, Linderman restructured the loan secured by her primary mortgage through a Home Affordable Mortgage Program ("HAMP") agreement.[4] Countrywide's corporate successor, Bank of America,

---

[4] "In response to rapidly deteriorating financial market conditions in the late summer and early fall of 2008, Congress enacted the Emergency Economic Stabilization Act. The centerpiece of the Act was the Troubled Asset Relief Program, which required the Secretary of the Treasury, among many other duties and powers, to 'implement a plan that seeks to maximize assistance for homeowners and...encourage the servicers of the underlying mortgages...to take advantage of...available programs to minimize foreclosures.'" *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012) (cleaned up).

was a party to that agreement. The HAMP restructuring neither covered nor addressed the HELOC. Linderman received no communications about the HELOC from anyone, including monthly statements, from 2009 to 2024.

According to Linderman and the Consumer Financial Protection Bureau, this was a fairly common occurrence in the wake of the housing crisis.[5] Housing prices plummeted after 2008, and because the holders of the junior mortgages would only recover in foreclosure after the holders of the primary mortgages, those junior mortgage holders by and large charged off the debts and forgot about them (which was easy enough, given that they had almost all been placed into trusts, carved into tranches, and sold off in pieces as securities). Likewise according to the CFPB, as home prices have recovered, and as some of the borrowers on these junior mortgages have stabilized financially and then paid off significant portions of the loans secured by the primary mortgages, the idea of threatening foreclosure on the junior mortgages, with

---

HAMP was one program set up under TARP; it incentivized lenders to restructure loans for borrowers, like Linderman, who were in default or likely to end up in default. *Id.* at 556–57.

[5] Much of the background information in Linderman's complaint comes from the CFPB's Advisory Opinion 2023-4. ECF 42 at 1–2.

the added benefit of all of the interest that had silently accrued in the interim, began to seem like an increasingly attractive idea.

In July 2024, Linderman received a letter from Shellpoint announcing that Shellpoint would be servicing the HELOC. Shellpoint also sent along a billing statement listing $87,080.13 as Linderman's principal balance, $136,987.46 in monthly charges from September 2008 to August 2024, a $45 fee for a property inspection, and $1,175.34 in "Finance Charges."[6] ECF 42-1 at 40. The statement set interest at 13% annually. In August 2024, Shellpoint sent another letter about the principal balance, this time omitting any mention of interest. In October 2024, Shellpoint sent Linderman a letter recommending that she get housing counseling and warning her that she would be subject to legal action after another thirty days. In November, Shellpoint sent another letter, this time asking for a total of $140,066.82 by December of 2024. Failure to make that payment would "result in

---

[6] Shellpoint's communications never make clear how exactly it arrived at the monthly charge numbers. Were one to charge 13% interest on $87,000 and compound it yearly from 2009 until 2024, the numbers involved would be something close to four times higher than $136,987.46. Indeed, just charging 13% of $87,000 each year since 2009 without compounding it would result in a significantly higher number than $136,987.46. There are other anomalies on the July 2024 billing statement, including a line that reads "Previous Balance: $294,193.16," which as far as I can see is a number neither party has identified or explained. ECF 42-1 at 40.

acceleration of the sums secured by the [mortgage], foreclosure by judicial proceeding and sale of the property." *Id.* at 33. At some point, Linderman wrote Shellpoint to ask who owned her loan; Shellpoint responded both that BNYM was the indenture trustee of the loan and, injecting some confusion into proceedings, that BNYM was also the owner. *Id.* at 30.

Linderman then filed suit, arguing that defendants' attempts to collect interest on the HELOC after their long silence was unlawful. She asserts that their activities run afoul of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.* (Count II), and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.* (Count IV). She also requested declaratory and injunctive relief (Count VI).[7]

### III.

Linderman's claims each work by piggybacking one statute off of another. In Count II, she alleges that defendants' attempts to collect on the HELOC interest violate a certain provision of the

---

[7] Details of the issues relevant to Counts I, III, and V can be found in my opinion dismissing them, *Linderman v. NewRez LLC*, 808 F. Supp. 3d 898 (N.D. Ill. 2025), and in my opinion denying reconsideration of that dismissal, *Linderman v. NewRez LLC*, 814 F. Supp. 3d 966 (N.D. Ill. 2026). While the discussion in this opinion will cover some of the same legal points, readers can find the opinion granting Linderman leave to amend following the dismissal of her prior complaint in *Linderman v. NewRez LLC*, 814 F. Supp. 3d 971 (N.D. Ill. 2026).

Illinois Interest Act, 815 ILCS 205/0.01, *et seq.*, making the attempts, by extension, a violation of the FDCPA. In Count IV, she maintains that the attempts to collect on the HELOC interest run afoul of a public policy announced by the Interest Act, which makes the attempt to collect a violation of the ICFA. And in Count VI, she premises her requests for declaratory and injunctive relief on whichever of the previous theories holds water.

I will take each of these in turn. But there is one preliminary matter that has troubled this case from the beginning— exactly whose names should be in the case caption below Linderman's. After some trial and error, Linderman has named the HELOC's servicer, Shellpoint; its technical owner, the Trust; and the loan's effective owner, BNYM (effective in the sense that BNYM is the Trust's legal representative). Defendants first suggested that it might be that the Trust could not be sued in its own capacity. ECF 49-1 at 14 (quoting *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 914 (7th Cir. 2013) on common law trusts). Linderman pointed out that the Trust is a Delaware statutory trust, which is specifically empowered to sue and be sued in its own name. ECF 52 at 14–15 (citing the Delaware Statutory Trust Act, 12 Del.C. § 3801 *et seq.*). Defendants then replied that, if not improper, it was at least redundant to name the Trust.

The ownership, assignment, and delegation of the various rights pertinent to the HELOC have been somewhat opaque. As a result, and out of an abundance of caution, I will keep the Trust in the suit in case its presence ends up being necessary.

## A. The Fair Debt Collection Practices Act

There is one preliminary to sort out before addressing the meat of Linderman's argument. She has pled her FDCPA claim against all three defendants, and they have pointed out that under the plain terms of that statute, the provisions Linderman cites only apply to a "debt collector," meaning an entity which "regularly collects or attempts to collect...debts owed or due...another." 15 U.S.C. §§ 1692a(6), 1692c, 1692e. Shellpoint is concededly a debt collector, say defendants, but BNYM and the Trust are not.

Linderman does not respond to this argument, and I agree with defendants that the relevant portions of the FDCPA apply only to Shellpoint. I dismiss Count II as to BNYM and the Trust.

The remainder of Linderman's theory in Count II runs this way. At common law, interest is a creature of statute, and collectable only when so authorized. *City of Springfield v. Allphin*, 413 N.E.2d 394, 396 (Ill. 1980). In Illinois, the Interest Act governs the collection of interest (at least in areas not preempted by national banking acts, *see*, *e.g.*, *McCarthy v. Option One Mortg. Corp.*, 362 F.3d 1008, 1010-1013 (7th Cir. 2004)). The

10

Interest Act addresses revolving credit agreements like the HELOC. 815 ILCS 205//4.1 (defining), 4.2 (regulating). The Act makes it lawful "to receive or contract to receive and collect interest" from revolving credit agreements where the agreements comply with the various subsections of Section 4.2. Subsection 4.2(b) holds that lenders "must" send regular billing statements including various specified items of information. And then Section 5 of the Act stipulates that "[n]o person or corporation shall directly or indirectly accept or receive, in money, goods, discounts or thing in action, or in any other way, any...greater value for the loan...than is expressly authorized by this Act or other laws of this State."

This amounts, says Linderman, to a prohibition on the collection of interest pursuant to revolving credit agreements in the absence of regular statements. As such, Shellpoint was attempting to collect unlawful interest, which is expressly prohibited by the FDCPA. 15 U.S.C. § 1692f(1) (prohibiting the "collection of any amount...unless such amount is...permitted by law"). Linderman maintains that Shellpoint's actions also ran afoul of several provisions in Section 1692e, which prohibits debt collectors from making various false or misleading representations.

Defendants' arguments in their motion to dismiss focus on the Interest Act. The Act contains a penalty section which provides for recovery of "twice the total of all interest, discount and charges determined by the loan contract or paid by the obligor, whichever is greater, plus such reasonable attorney's fees and court costs" where anyone subject to the Act "knowingly contracts for or receives...unlawful interest...in connection with any loan of money." 815 ILCS § 205/6. This, say defendants, makes the entire Interest Act a penal statute, which must be strictly construed. Because loan servicers like Shellpoint neither "contract for" nor "receive" unlawful interest (rather, they pass it onto the creditors or their assignees), the Act does not apply to Shellpoint. Likewise, the penalty provision only applies where unlawful interest has been "contracted for" or "receive[d]." *Id.* Here, the original HELOC contract did not provide for unlawful interest (it in fact required monthly statements), and none of the defendants have received anything from Linderman. So, defendants say, the penalty provision thus does not apply to them and, *ipso facto*, neither does the rest of the Act. If there is no violation of the Interest Act, then there can be no violation of the FDCPA, and, they contend, the claim must be dismissed.

Linderman says little about these arguments in her response, other than to point out that, given that the purpose of the

12

Interest Act is to protect borrowers, "it should be construed liberally to effectuate that purpose," and, since she is not trying to invoke the penalty provision, the statute need not be read in light of that provision.[8] ECF 52 at 6. Defendants reiterate in their reply that the Interest Act must be strictly construed, and that "[t]his rule of construction applies to the statute as a whole, not merely to its penalty provisions." ECF 53 at 7.

To my eyes, except for the argument Linderman made in her complaint, the parties' positions are somewhat off the mark, both in terms of how they treat the question of "strict" or "liberal" construction and in terms of where they focus in the Interest Act.

In the first place, it is not necessarily true as a principle of statutory construction that a statute which contains a penal provision thus becomes a penal statute in its entirety. "A statute which is both penal and remedial should be considered as a penal statute when it is sought to enforce the penalty and as a remedial statute when it is sought to enforce the remedy or the purpose and should be construed accordingly." 82 C.J.S. Statutes § 512; *accord* 3 Sutherland Statutory Construction § 59:1 (8th ed.) ("If the

---

[8] Linderman's response to the motion to dismiss and defendants' reply are both more focused on questions of public policy, which I will turn to when I address Linderman's ICFA claim.

redress is remedial to an individual and affects the public only indirectly, the law is not solely and strictly penal.").

But even if I take the Interest Act as a solely penal statute and accept that I must strictly construe it, the question that follows is: strictly construe it as to what? Defendants take strict construction to mean that I should take the limitations of the penalty provision (that it applies only where unlawful interest has been contracted for or successfully collected) and read those back into all the other sections of the statute. Linderman seemingly accepts the premise that this is what strict construction would entail and suggests that I should be more liberal. There are two problems, though: first, defendants' own cases show that Illinois courts have a different idea in mind when they write "strict construction;" and second, this case has nothing to do with the penalty provision at all.

### 1. Strict Construction

Defendants cite *Summers v. Summers*, which is illustrative. 239 N.E.2d 795 (Ill. 1968). In that case, plaintiff drove her car to defendant's home and invited him to go for a drive. *Id.* at 797. He went, now driving the car, with plaintiff in the passenger seat. *Id.* They crashed, and plaintiff sued for negligence. *Id.*

The question the Illinois Supreme Court confronted was whether defendant could invoke the Illinois guest statute to cut

off his liability, despite that he was driving plaintiff's car and not (as guest statutes usually work) the other way around.[9] Because the guest statute was in derogation of the common law, it would have "to be strictly construed and nothing [would] be read into [it] by intendment or implication." *Id.* at 798.

Read literally, the plain text of the guest statute would have allowed its use: "'No person riding in or upon a motor vehicle...as a guest without payment for such a ride, or while engaged in a joint enterprise with the owner or driver of such...shall have a cause of action for damages[.]'" *Id.* at 797 (quoting Ill. Rev. Stat. 1965, chap. 95 1/2, par. 9-201). While the statute could be read to require that the driver be the owner of the vehicle, the more plausible reading is that ownership is irrelevant; if a person is "riding in or upon a motor vehicle" while "engaged in a joint enterprise with the...driver," then the statute seems to say that that person cannot sustain an action for damages against the driver. *Id.* But the *Summers* court came to the opposite conclusion:

_____

[9] Guest statutes provide a defense to car owners who, out of the goodness of their heart, give someone a free ride and who, out of the poorness of their driving, then injure that person. "The primary purpose of such statutes is one of social equity, to relieve from hardship one who has acted generously in transporting another without compensation." 60A C.J.S. Motor Vehicles § 878.

15

> In our judgment, the legislative intent underlying the guest statute, as found in the cases previously mentioned, is consistent with, and calls for, such a holding. The primary purpose of the statute is to protect and promote the interests of those who gratuitously extend the hospitality of their motor vehicles. Under the circumstances here, it is manifest that plaintiff extended the hospitality of her vehicle to defendant and that this relationship was not changed by the fact of his driving. We hold, in accord with the majority of jurisdictions which have considered this question, that plaintiff, an owner-occupant, is not a 'guest' within the meaning of the guest statute.

*Id.* That is, the *Summers* court strictly construed the guest statute to effectuate the legislature's underlying purpose in the teeth of its literal text.

Which is to say that when Illinois courts write "strict construction," they do not mean "strictly literal" or "narrow," but rather something like "strictly in line with the legislature's intent" or "strictly in line with the primary purpose of the statute." This is exactly the understanding that the Illinois Supreme Court expressed in *City of Elmhurst v. Buettgen*: "A penal ordinance will not be so literally construed as to produce an absurd result, which, although within its letter, is contrary to its spirit." 68 N.E.2d 278, 282 (Ill. 1946). Defendants' main citation in this area, *Saskill v. 4-B Acceptance*, is similarly focused on legislative intent rather than literalism. 487 N.E.2d 97, 98 (Ill. App. Ct. 1985) ("[S]uch statutes allowing fees should be strictly construed. In interpreting a statute, we must give

16

effect to the legislature's intent, as found in the specific language of the statute.").

As stated in another decision from the same case, "The purpose of the [Interest Act] is to protect weak and necessitous borrowers, such as plaintiff, from oppression of unscrupulous lenders." *Saskill v. 4-B Acceptance*, 453 N.E.2D 761, 766 (Ill. App. Ct. 1983);[10] *accord Com. Mortg. & Fin. Co. v. Life Sav. of Am.*, 541 N.E.2d 661, 665 (Ill. 1989). So, inasmuch as defendants may be right that I must read the entire Interest Act strictly, it is in the sense of strictly in line with the legislature's intent to protect borrowers.

## 2. Interpreting the Interest Act

Both parties focus on Section 6 of the Act, the penalty provision. That section deals with unlawful contracts and with interest actually collected. 815 ILCS § 205/6. Defendants rightly point out that the HELOC, if exploitative, is lawful, and that they never managed to get any interest out of Linderman. And they rightly point out that the penalty provision thus does not apply to them. But this is all beside the point: Linderman's contention is not that defendants contracted for or actually collected

---

[10] The earlier *Saskill* decision dealt with damages under the Interest Act, while the later decision dealt with appellate attorney's fees.

17

unlawful interest; it is that by failing to send monthly statements, they lost the right to collect any interest under Sections 4.2 and 4.2(b). This was, explicitly, the theory under which I allowed Linderman to amend her complaint. *Linderman*, 814 F. Supp. 3d at 975-76. Defendants do not seem to have addressed it. Linderman, for her part, articulated this theory in her complaint but spent her response combating the defendants' penalty provision argument rather than developing it further. Nevertheless, Linderman's theory is viable.

The Interest Act defines "revolving credit" as an arrangement in which "the lender may from time to time make loans or advances...which loans or advances are charged to an account in respect of which account the lender is to render bills or statements to the debtor at regular intervals." 815 ILCS 205/4.1. The Act provides that a "revolving credit arrangement which grants the debtor a line of credit in excess of $5,000 may include provisions granting the lender a security interest in real property...to secure amounts of credit extended by the lender." *Id.* This definition includes—and defendants do not dispute that it includes—the HELOC at issue in this case.

The Interest Act then requires that for lenders "to [lawfully] receive or contract to receive and collect interest in any amount or at any rate agreed upon by the parties to the revolving credit

18

arrangement," they "must" comply "with subparagraphs (a), (b), (c), (d) and (e)" of Section 4.2. Subparagraph (b) then holds that:

> If during any billing cycle any debit or credit entry is made to a debtor's revolving credit account, and if at the end of that billing cycle there is an unpaid balance owing to the lender from the debtor, the lender must give to the debtor the following information within a reasonable time after the end of the billing cycle:
>
> > (i) the unpaid balance at the beginning of the billing cycle;
> >
> > (ii) the date and amount of all loans or advances made during the billing cycle, which information may be supplied by enclosing a copy of the drafts, items, orders for the payment of money, evidences of debt or similar written instruments presented to the lender during the billing cycle;
> >
> > (iii) the payments by the debtor to the lender and any other credits to the debtor during the billing cycle;
> >
> > (iv) the amount of interest and other charges, if any, charged to the debtor's account during the billing cycle;
> >
> > (v) the amount which must be currently paid by the debtor and the date on which that amount must be paid in order to avoid delinquency;
> >
> > (vi) the total amount remaining unpaid at the end of the billing cycle and the right of the debtor to prepay that amount in full without penalty; and
> >
> > (vii) information required by (iv), (v) and (vi) must be set forth in type of equal size and equal conspicuousness.

The language of the Act requires that, for the collection of interest to be lawful, it must be preceded by the issuance of billing statements which comply with the requirements of Section

4.2(b).[11] And Section 5 of the Act prohibits any collection of unlawful interest: "No person or corporation shall directly or indirectly accept or receive...any greater sum...than is expressly authorized by this Act."

Defendants' contention, that the language in the penalty provision should be read backwards into these earlier statutory provisions, so as to prevent their coming into force absent the successful collection of interest, is uncompelling for several reasons.

First, the penalty provision does not apply to *any* collection of unlawful interest but instead is a special punishment provided for a special case: the *knowing* collection of unlawful interest. *Com. Mortg. & Fin. Co.*, 541 N.E.2d at 664–65 (recognizing that while Section 5 creates a prohibition on unlawful interest, Section 6 creates special penalties for knowing violations). This special case does not obtain here because, again, no one has collected any interest, and the HELOC itself does not provide for any unlawful interest.

---

[11] This makes sense if the purpose of the statute is to "protect weak and necessitous borrowers." *Saskill*, 453 N.E.2D at 766. The relatively high interest rates on revolving credit arrangements, like credit cards, necessitate protecting consumers by letting them know just how quickly interest builds up.

Second, the Interest Act was drafted to regulate transactions and contracts involving interest, rather than to act only as a penal statute for knowing violators, and Illinois courts have interpreted it as such.

Take, for example, *Commercial Mortgage & Finance Co.* In that case, defendants were a married couple. *Id.* at 661. They took out several personal loans from plaintiff. *Id.* Defendants were unable to make their payments on the last of these personal loans and returned to their loan officer asking for a restructuring. *Id.* at 662. Plaintiff was open to restructuring the loan, but given the risks involved, wished to charge an interest rate higher than that allowed for personal loans under the Interest Act. *Id.* at 663. So, plaintiff proposed that defendants make out the paperwork as if it were for a business loan, which would be exempt from the limits under the Act. *Id.* Defendants did so (and did so several more times) before ultimately defaulting. *Id.* at 662. Plaintiffs sued, and defendants raised a defense of usury under the Interest Act. *Id.* at 662–63. Defendants did not invoke Section 6 or claim the statutory penalty or attorney's fees. *Id.* at 662. Plaintiffs argued that, because defendants had participated in creating the usurious contract, they should be estopped from asserting usury. Among other responses to this argument, the court wrote that:

> Moreover, a rule of law that precludes borrowers from
> raising the usury defense simply because they initiate

and then participate in securing the loan would be inconsistent with the Illinois usury statute. Section 5 of the Interest Act...prohibits the acceptance or receipt of interest in excess of that authorized by law...the legislature intended that lenders, and not borrowers, should bear the risk of engaging in a usurious transaction. We see no reason to shift the risk to the borrower in this case where the lender initiated the usurious aspect of the loan and where the lender and borrower then jointly participated in the plan to evade the usury statute.

*Id.* at 664–65. The import of this holding is that defendants could invoke the protections of the Act without reference to the penalty provision—it was unlawful to collect interest in violation of the Act, regardless of whether the particular contract or interest met the requirements of Section 6. *Accord First Am. Title Ins. Co. v. TCF Bank, F.A.*, 676 N.E.2d 1003, 1007 (Ill. App. Ct. 1997) (finding application of Section 4.1 without any reference to the penalty provision of Section 6).

Third, reading the penalty provision backward into the rest of the Act would "produce an absurd result, which," while not clearly within its letter, would definitely be "contrary to its spirit." *City of Elmhurst*, 68 N.E.2d at 282. One strange outcome would be that, while it would have been unlawful, and subject to double damages, for defendants to have *collected* interest in violation of Section 4.2, it would not be unlawful to *attempt* to collect interest in violation of Section 4.2. Another is that, because the penalty provision only applies (in defendants'

22

reading) to lenders and their assignees, it would be unlawful for BNYM or the Trust to collect interest in violation of Section 4.2, but it would be perfectly permissible for Shellpoint to collect it. This has the odd effect that while lawful in Shellpoint's hands, the interest would become unlawful once Shellpoint had turned it over to BNYM or the Trust, at which point Linderman could sue to get it back.

### 3. Bringing the Statutes Together

Having worked through the above, it becomes simple to evaluate Linderman's claim under Rule 12(b)(6). Shellpoint is a "debt collector" under the FDCPA. 15 U.S.C. § 1692a(6). It is a violation of the FDCPA for a debt collector to attempt to collect interest on a debt which is not permitted by law. *Id.* § 1962f(1). It is likewise a violation to misrepresent the amount or legal status of a debt, to threaten foreclosure when foreclosure would be unlawful, or to threaten "any action that cannot legally be taken." *Id.* §§ 1962e(2), (4), (5). It is unlawful to collect interest on a revolving credit arrangement in Illinois absent the sending of regular statements. 815 ILCS 205//4.2, 5. Shellpoint, Linderman has alleged, has been trying to collect interest on a revolving credit arrangement pursuant to whichno onee sent any statements for fifteen years. Linderman has thus stated a claim in Count II as to Shellpoint.

## B. The Illinois Consumer Fraud and Deceptive Business Practices Act

As with the FDCPA claim in Count II, Linderman launches her ICFA claim by way of the Interest Act, though less straightforwardly in this count.

The ICFA is a "regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). Litigants can assert either a deceptive or an unfair practice under ICFA, each subject to its own test. *Id*. Linderman has alleged only an unfair practice.

To determine whether a business practice is unfair, I consider "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers." *Id.* at 961 (citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n. 5 (1972)). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.; see also Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.,* 536 F.3d 663, 669 (7th Cir.2008).

The parties have largely confined their arguments to the public policy factor. Linderman contends that the Interest Act evinces a public policy in Illinois that interest is not to be collected on revolving credit arrangements absent the sending of regular statements and that defendants' attempt to do so thus constitutes an unfair practice under ICFA. She also suggests in her response to the motion to dismiss that attempting to collect on these so-called "zombie mortgages" when consumers who managed to keep their houses and become current on their primary mortgages after the 2008 financial crash is also "immoral, unethical, oppressive, or unscrupulous" all on its own, but neither she nor defendants have done much briefing as to this argument.[12]

Defendants have three grounds for dismissing Linderman's ICFA claim. The first mirrors their argument above: that because Section 6 of the Interest Act does not apply here, there is no claim under that law and thus no derivative claim under ICFA. The second is that the ICFA enumerates which other statutes constitute a violation and that that exclusive list does not include the Interest Act. And the third is that ICFA requires the pleading of

---

[12] Nor does either party explicitly address the "substantial injury" factor from *Robinson*, but they have briefed the issue of damages, which I will deal with in Section III.B.3, below.

actual, pecuniary harm, and that Linderman has failed to do so. I will take these in turn.

### 1. Public Policy and the Interest Act

Defendants maintain that "it is not plausible that the amounts sought by Shellpoint from Plaintiff are contrary to public policy when the Illinois legislature determined that liability under the Interest Act attaches only when a lender (which Shellpoint is not) contracts for or receives unlawful interest (which did not happen and is not alleged)." ECF 49-1 at 16. Defendants cite *Ristic v. Mach. Zone, Inc.*, and *Overstreet v. CIT Mortg. Home Loan Tr. 2007-1*, for the proposition that if an action does not violate a statute, it cannot then violate a "public policy" allegedly evinced by that statute for the purposes of making out a derivative ICFA violation. 2016 WL 4987943, at *1 (N.D. Ill. Sept. 19, 2016); 2017 WL 1022079, at *1 (N.D. Ill. Mar. 16, 2017).

Linderman responds that under *Robinson*, a given practice need only offend some sensibility within the "penumbra" of a common law or statutory principle to offend public policy, and that here, defendants' collection practices offend at least Section 4.2(b) of the Interest Act.

I have already found in Section III.A.2., above, that attempting to collect interest without having sent regular statements will violate Section 4.2 of the Interest Act. But

26

assuming, *arguendo*, that I was wrong above, and that the Interest Act's mandate that lenders send regular statements does not prevent the accrual of interest in the absence of such statements, it is clear that the Interest Act evinces at least a public policy that lenders and other collectors of interest on revolving credit arrangements send statements.

As Linderman argues, in *Robinson*, the Illinois Supreme Court adopted reasoning from the U.S. Supreme Court in *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972). The ICFA provides that in construing it, "consideration should be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." 815 ILCS 505/2. Noting that passage, the *Robinson* court looked to *Sperry* for guidance as to "the interpretations of the Federal Trade Commission," and borrowed the three unfairness factors from that case. *Robinson*, 775 N.E.2d at 961. The *Robinson* court pulled the factors from *Sperry*'s fifth footnote, which in turn drew them from the FTC's interpretation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.*:

> The Commission has described the factors it considers in determining whether a practice that is neither in violation of the antitrust laws nor deceptive is nonetheless unfair:
>
> '(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, *the common*

> *law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness*; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).' Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking. 29 Fed.Reg. 8355 (1964).

*Sperry*, 405 U.S. 244 n.5 (emphasis added). Linderman gets her "penumbra" language from the italicized portion of the footnote. Linderman is correct that *Robinson* approves of this language—the case has three pincites to *Sperry*, each referencing footnote five. 775 N.E.2d at 961. And she is correct that the language is spacious enough to accommodate behavior which is not in direct violation of law and does not give rise to an independent cause of action but which nevertheless offends "public policy as it has been established by statutes, the common law, or otherwise." *Sperry*, 405 U.S. at 244 n.5. Defendants' citations to *Ristic* and *Overstreet* are not to the contrary.

In *Ristic*, the court considered whether aspects of a mobile phone-based videogame called "Game of War" ran afoul of the Illinois Loss Recovery Act ("ILRA") and, as a result, violated ICFA. 2016 WL 4987943, at *1. Like many mobile games, Game of War allowed players to purchase, for real money, virtual in-game currency. *Id.* Once purchased, the in-game currency could not be converted back into ordinary fiat currency. *Id.* Players could use

28

the currency to do various things in-game, including purchasing virtual items. *Id.* As with the virtual money, there was no in-game mechanism to convert in-game items into real-world money. *Id.* Game of War contained a feature called the "Casino," which allowed players to pay in-game virtual currency for a chance to win in-game virtual prizes. *Id.*

The court initially decided that the Casino did not violate the ILRA. *Id.* at *2-*3. To state a claim under that statute, a litigant must allege "(1) that he has lost to any other person, any sum of money or thing of value, amounting to the sum of $50 or more; (2) that the loss occurred through the act of gambling; and (3) that [the gambling venue] was the winner of [the litigant's] gambling loss." *Id.* at *2. (cleaned up). The court found that, at base, nothing happening inside of the Game of War mobile application was gambling in any sense. The court reasoned that there was no "loss" or "win" in the first place, because the only occurrence involving any "real" money was the initial purchase of the in-game currency. *Id.* at *3. After that, a player's "wins" or "losses" in the Casino had nothing to do with any real money at all; a player's winning better prizes at the Casino would at best diminish their desire to purchase more in-game currency and vice versa. The court found neither scenario sufficient to constitute a "win" or "loss" for either the player or the owners of the game.

*Id.* The court then concluded that, since the Casino did not violate the ILRA, it also did not offend the ICRA. *Id.* at *3–*4.

The court in *Ristic* did not find that, while the Casino violated the spirit of the ILRA, it failed to violate its letter and thus could not constitute an ICRA violation. Rather, the court found that the Casino had nothing to do with gambling, or the ILRA, at all. Reasonable minds might differ about that conclusion, but the reasoning behind it does little to help defendants here, where the law in question, the Interest Act, has very much to do with the activity alleged in the complaint.

The citation to *Overstreet* is similarly unavailing. There, the court considered a situation superficially analogous to the instant one. Plaintiff obtained a subprime mortgage in 2005 which was bundled into a securitized trust shortly thereafter. 2017 WL 1022079, at *1. Among other happenings, plaintiff had problems paying in 2015 and eventually attempted to force rescission of the loan.[13] *Id.* The lender refused to rescind, and plaintiff filed suit, alleging, among others, an ICFA violation. *Id.* Plaintiff asserted three unfair practices under ICFA: (1) that her lender had not been registered under the Illinois Residential Mortgage

---

[13] The grounds for recission were immaterial to her eventual ICFA claim. 2017 WL 1022079, at *1.

License Act ("RMLA") at the time of the loans, rendering them void; (2) that her lender offered her a subprime loan despite her having good enough credit for a non-subprime loan; and (3) that after her attempt to rescind, her loan servicer assessed her a fee for a "broker price opinion ('BPO')," something "which is typically used to determine the potential sales price or value of a real estate property." *Id.* at *1, *3.

As to the first of these theories, the court noted that the Illinois legislature had specifically amended the RMLA such that a lender's failure to register would not void loans the lender had made while unlicensed. *Id.* at *5–*6. That is, enforcing unlicensed loans could not violate public policy because the explicit policy of the legislature was to permit (or at least not to void) unlicensed loans. *Id.*

As to the subprime offer, the court's problem was that "Plaintiff does not identify any specific statutory provision, common law doctrine, or any other public policy that was violated." *Id.* at *6. Plaintiff ran into the same problem with the BPO fee— the issue was not that the fee offended but did not create a cause of action under some other statute; rather plaintiff failed to identify "*any* public policy that prohibits assessment of a BPO fee." *Id.* at *7 (emphasis added).

In contrast to the situations above, the Interest Act announces a public policy that the collecting parties to revolving credit agreements should—given that the statute says "must"—provide the borrowing parties regular statements detailing the interest accrued. 815 ILCS 205/4.2(b). The Interest Act as a whole, moreover, embodies the public policy of the legislature "to protect weak and necessitous borrowers...from oppression of unscrupulous lenders." *Saskill*, 453 N.E.2d at 766. And "a plaintiff may prove an ICFA unfairness claim by showing that the challenged practice...violates a standard of conduct contained in an existing statute...that typically applies to such a situation," even if "[i]t is undisputed" that the statute in question does not "create[] a private right of action." *Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Morg. Loan Trust, Series 2003-1*, 787 F. Supp. 747, 752 (N.D. Ill. Apr. 12, 2011) (citations omitted) (collecting cases).

An attempt to collect interest pursuant to a revolving credit agreement following failure to send regular statements thus at the very least offends public policy such that it constitutes an "unfair practice" under the ICFA.[14]

---

[14] It is also, likely, an unfair practice under *Robinson*'s second factor, that it is "immoral, unethical, oppressive, or unscrupulous." 775 N.E.2d at 961. Neither party has developed arguments as to this factor, but two California courts have

considered a similar question and concluded that collection on long-defunct junior mortgages like Linderman's falls into this category.

The courts in *Gonzalez v. Specialized Loan Servicing, LLC*, 691 F. Supp. 3d 1162 (C.D. Cal. 2023) and *Naranjo v. Bank of America, N.A.*, 2023 WL 8885144, at *1 (C.D. Cal. Nov. 17, 2023) both considered a situation where a plaintiff acquired a junior mortgage, defaulted on both mortgages in the wake of 2008, declared bankruptcy, stopped receiving communications or statements regarding the junior mortgage, managed to become current on the senior mortgage, and then was surprised years later by a new party claiming interest on the loan secured by the junior mortgage for the interim period. *Gonzalez*, 691 F. Supp. 3d at 1168–69; *Naranjo*, 2023 WL 8885144, at *1-*2.

Plaintiffs in each case advanced claims under California's Unfair Competition Law ("UCL"), which, like ICFA, prohibits "unfair" practices, even where those practices do not necessarily violate any other law. *Gonzalez*, 691 F. Supp. 3d at 1177; *Naranjo*, 2023 WL 8885144 at *6-*7. The basis for unfairness was, in part, a breach of the implied covenant of good faith and fair dealing. *Gonzalez*, 691 F. Supp. 3d at 1177; *Naranjo*, 2023 WL 8885144 at *2, *6-*7.

The *Gonzalez* court found that plaintiff had plausibly alleged such a breach, writing:

> The Court notes that it does not believe that "in the name of good faith" California imposes a duty "to make every contract signatory his brother's keeper[.]" *Mkt. St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 593 (7th Cir. 1991). However, assuming a contractual responsibility to collect a debt without informing the other party, taking no steps to facilitate payment for 14 years, while charging interest the entire time is at best the kind of "sharp dealings or unfair practices" that are impermissible between contracting partners. *Hischemoeller v. Nat'l Ice & Cold Storage Co. of Cal.*, 46 Cal. 2d 318, 328, 294 P.2d 433 (1956). At worst, this conduct is a form of outright deception. The Court echoes Judge Posner's observation that before parties enter into a contractual relationship, they "confront each other with a natural wariness. Neither expects the other

33

---

> to be particularly forthcoming, and therefore there is no deception when one is not." *Frey*, 941 F.2d at 594. Once the contract is formed, however, "the situation is different. The parties are now in a cooperative relationship the costs of which will be considerably reduced by a measure of trust. So each lowers his guard a bit, and now silence is more apt to be deceptive." *Id.* As alleged in this case, Defendant's 14-year silence was deafening.

691 F. Supp. 3d at 1173–74. And the court later held that "breach of the covenant of good faith and fair dealing may give rise to liability under California's UCL." *Id.* at 1177. The court in *Naranjo* further explained:

> Plaintiffs contend that Defendants and their predecessors neglected their obligations to Plaintiffs for a decade, leading Plaintiffs to believe that the Loan had been forgiven, only to be revived once they had built up enough equity in their home for it to be worth being foreclosed upon. Plaintiffs also assert that the activity that led them to believe the Loan had been forgiven allowed interest and fees to accumulate that would not otherwise have accumulated. This conduct could reasonably be described as 'unfair.'

2023 WL 885144, at *7 (citing the above block-quoted passage from *Gonzalez*).

Like these plaintiffs, Linderman could probably find support in Judge Posner's opinion in *Frey* for the proposition that the failure to communicate for more than a decade, which resulted in the piling up of interest which might otherwise have been paid and which prevented a restructuring of the loan which might have avoided her home ever being at risk, was "immoral, unethical, oppressive, or unscrupulous" apart from its violation of the Interest Act.

At this stage, Linderman is obliged to plead facts, not legal theories, and she could advance additional theories of relief down the line. *Chessie Logistics Co v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017).

34

## 2. Section 505/2Z Enumerated Statutes

Defendants next argue that even if their conduct offends or violates the Interest Act, it does not violate the ICFA. Their reasoning is that the ICFA contains a list of statutes the violation of which constitutes "an unlawful practice within the meaning" of that act. 815 ILCS 505/2Z.  The Interest Act does not appear in that list. *Id.* Under the principle of *expresio unius est exclusio alterius*, then, violation of the Interest Act cannot be a violation of the ICFA.

Linderman responds, and I agree, that Section 505/2Z is not an exclusive list. Rather, by its own terms, Section 505/2Z indexes statutes where a knowing violation will constitute a *per se*

---

As a last note, it may be of interest that this case has a link to the two from California. The servicer from *Gonzalez*, Specialized Loan Servicing, has been subsumed by the instant defendant NewRez d/b/a Shellpoint in the wake of fines and settlements levied against Specialized Loan Servicing as a result of widespread lending misconduct.

*E.g.,* "Specialized Loan Servicing, LLC," Enforcement Actions, CFPB (May 11, 2020), https://www.consumerfinance.gov/enforcement/actions/specialize d-loan-servicing-llc/;

"Rithm Capital to Acquire Specialized Loan Servicing LLC," SEC (visited Apr. 30, 2026), https://www.sec.gov/Archives/edgar/data/1556593/00011403612304 6126/ef20011745_ex99-1.htm (NewRez is a wholly-owned subsidiary of Rithm Capital).

violation of ICFA. "The violation (knowing or unknowing) of other statutes, regulations, or legal rules does not automatically predicate an ICFA claim, but can predicate a claim if the alleged misconduct is independently deceptive or unfair within the meaning of the ICFA." *Boyd*, 787 F. Supp. 2d at 755 (collecting cases). As stated above, the alleged misconduct here is independently unfair within the meaning of the ICFA.

### 3. Adequate Pleading and Damages

Defendants finally argue that Linderman has failed to make out actual pecuniary harm as required under the ICFA. Preliminary to that contention, they also maintain that I should hold Linderman's complaint subject to the higher pleading standards for alleged fraud under Federal Rule of Civil Procedure 9(b). Defendants contend that although Linderman has framed her claims as regarding "unfair," rather than "deceptive" business practices, her complaint still "sounds in fraud" because it is based on "intentional conduct." ECF 49-1 at 18 (citing *Haywood v. Massage envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018)).

I disagree. Fraud requires an inducement to action by way of a misrepresentation. *See Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996). Linderman has not alleged that through any deceit she was induced into any kind of loan or contract.

Rather, her pleadings paint a picture without much or any intent at all.

For her part, it appears that Linderman either assumed that her bankruptcy or her HAMP restructuring had taken care of the HELOC. Likewise, rather than pleading that her counterparties then purposefully laid in wait, the image that emerges is that her HELOC languished in a long-forgotten trust while various lenders and servicers dealt with their own tribulations after 2008. The wrongdoing emerges only recently, as a result of the rediscovery of the lucrative potential of the once-troubled assets contained in these securitized trusts.

Linderman's complaint does not sound in fraud and is subject only to the ordinary pleading requirements of Rule 8. *Windy City*, 536 F.3d at 670 ("Because neither fraud nor mistake is an element of unfair conduct under [ICFA], a cause of action under [ICFA] need only meet the notice pleading standard of Rule 8(a).").

As to damages, defendants are correct that to make out a cause of action under ICFA, a plaintiff must plead "actual damage as a result of a violation of [the] Act." 815 ILCS 505/10a. This is true even if the plaintiff seeks not damages but only injunctive relief. *Smith v. Prime Cable of Chicago*, 658 N.E.2d 1325, 1337 (Ill. App. Ct. 1995). "Actual damage" under ICFA means pecuniary injury, economic loss. *Kim v. Carter's Inc.*, 598 F.3d 362, 365

37

(7th Cir. 2010). Defendants assert, given that Linderman has not actually paid them anything, that she has not suffered any economic loss. Linderman responds that the addition of more than $50,000 to a loan secured by her house amounts to at least some economic harm.

The Seventh Circuit's decision in *Wigod v. Wells Fargo Bank, N.A.* resolves this question. 673 F.3d 547 (7th Cir. 2012). There, plaintiff obtained a mortgage in 2007 and found herself unable to make payments in 2009. *Id.* at 557–58. She requested a HAMP modification. *Id.* at 558. As HAMP worked at the time, a borrower was required to "provide documentary proof of her financial information." *Id.* If her lender found that she qualified for a HAMP modification, it could then put her on a Trial Period Plan ("TPP") where for "three or more months" the lender would collect diminished payments as if the loan had already been modified. *Id.* at 557. If the borrower managed to get through the TPP without having missed payments or otherwise failing to comply, "the servicer had to offer a permanent modification." *Id.*

Plaintiff provided her information, her lender found that she qualified, and it placed her on a TPP. *Id.* at 558. Plaintiff made payments and met her other obligations under the TPP, but at the end of the trial period, her lender refused to offer her a HAMP modification. *Id.* Plaintiff protested this decision and continued making payments as they had been reduced under her TPP. *Id.* Her

38

lender, meanwhile, sent "monthly notices threatening to foreclose if she failed to pay the accumulating amount of delinquency based on the original loan terms." *Id.* Plaintiff eventually sued, asserting, among many others, an ICFA claim. *Id.* at 574.

Defendant, her lender, asserted in response to the ICFA claim that plaintiff had not suffered any actual pecuniary loss. *Id.* at 575. The district court agreed, finding that because her "reduced trial plan payments were less than the amount she was legally obliged to pay [her lender] under the terms of her original loan documents...[she] was better off than she would have been without the TPP." *Id.* The Seventh Circuit disagreed, finding that her lender's reneging on her HAMP modification had prevented her from avoiding other costs, which it treated as having suffered damage:

> This reasoning overlooks Wigod's allegations that she incurred costs and fees, lost other opportunities to save her home, suffered a negative impact to her credit, never received a Modification Agreement, and lost her ability to receive incentive payments during the first five years of the modification. Prior to entering the trial plan, Wigod also could have taken the path of "efficient breach" and defaulted immediately rather than executing the TPP and making trial payments. By the time Wigod realized she would not receive the permanent modification she believed she had been promised, late fees had mounted and she found herself in default on her loan and with fewer options than when the trial period began.

*Id.*

Similarly, here, defendants' violation of ICFA by way of their violation of the Interest Act has at minimum deprived Linderman of

39

opportunities to avoid harm. She could have, for example, made payments at any time between 2009 and now, reducing the overall accumulation of interest; she could have modified the HELOC along with her primary mortgage in her own HAMP plan in 2014; she could have sidestepped a situation in which she would need to make a lump-sum payment of over $100,000 to save her house; she perhaps could have avoided, at the very least, the $45.00 in "Other Unpaid Fees/Charges" or the $1,175.34 in "Finance Charges" assessed against her in Shellpoint's July 2024 billing statement.[15] ECF 42-1 at 40. As she notes, on the plain face of her pleadings, her property interest in her home is now clouded by a claim from one of the largest banks in the world that her title is now encumbered by at least $50,000 more in debt than it had been before July 2024.

Linderman has adequately alleged pecuniary harm under ICFA. *Wigod*, 637 F.3d at 575–76; *accord Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 651 (7th Cir. 2015) ("[Defendant] argues [plaintiff] has not [adequately pled damages] because she defaulted on her loan and continues to owe money on that obligation. This argument is meritless. Of course [plaintiff] continues to owe money under her loan obligation. That does not

---

[15] She could perhaps have avoided other charges. As I noted in footnote 6, *supra*, the math behind the numbers in Shellpoint's letters is somewhat opaque.

mean she has not been damaged by [defendant's] imposing over $4,500 in unauthorized collection costs. These costs represent new charges that have been added to her accrued interest and principal, thereby increasing the amount she owes on her account...[plaintiff] has plausibly alleged damages, even if the remedy might take the form of a credit to her account rather than cash in her pocket.").

### C. The Remaining Claims

Defendants lastly move to dismiss Linderman's claims for injunctive and declaratory relief in Count VI and the class-based claims she asserts at each of the remaining counts. Defendants argue that, because the class and equitable claims are premised on the underlying FDCPA and ICFA counts, at which Linderman has failed to state a claim, these other claims must be dismissed. Because I disagree that Linderman has failed to state a claim at Counts II and IV, I disagree that her derivative claims must be dismissed.

### IV.

I grant defendants' motion as to the Trust and BNYM in Count II. I otherwise deny it.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**

United States District Judge

Dated: May 8, 2026